David B. Shemano (State Bar No. 176020)
*dshemano@pwkllp.com*
Monsi Morales (State Bar No. 235520)
*mmorales@pwkllp.com*
PEITZMAN, WEG & KEMPINSKY LLP
10100 Santa Monica Boulevard, Suite 1450
Los Angeles, CA  90067
Telephone: (310) 552-3100
Facsimile: (310) 552-3101

Proposed Counsel for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY  DIVISION

| | |
|---|---|
| In re<br><br>POLLO WEST CORP., a California corporation,<br><br>Debtor and Debtor in Possession. | Case No:  1:11-11433-VK<br><br>Chapter 11<br><br>**DECLARATION OF MICHAELA MENDELSOHN IN SUPPORT OF EMERGENCY MOTIONS OF DEBTOR-IN-POSSESSION FOR:**<br>**(1) ORDER AUTHORIZING DEBTOR TO PAY ACCRUED PRIORITY WAGES AND OTHER EMPLOYEE BENEFITS;**<br>**(2) ORDER AUTHORIZING AND APPROVING (A) USE OF CASH COLLATERAL, (B) GRANT OF ADEQUATE PROTECTION TO SECURED CREDITORS, AND (C) AUTHORIZING PAYMENTS PURSUANT TO 11 U.S.C. §§ 503(B)(9);**<br>**(3) ORDER EXTENDING TIME TO FILE SCHEDULES AND STATEMENTS;**<br>**(4) ORDER AUTHORIZING DEBTOR TO CONTINUE CERTAIN CUSTOMER PROGRAMS; AND**<br>**(5) ORDER AUTHORIZING JOINT ADMINISTRATION OF ESTATES**<br><br>**Hearing:**<br><br>Date: [TO BE SET]<br>Time: [TO BE SET]<br>Place: Courtroom 301<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA 91367 |

I, Michaela Mendelson, declare as follows:

1. I am the President of Pollo West Corp. ("Pollo West") and Mi Pollo, Inc. ("Mi Pollo," and collectively with Pollo West, the "Debtors"). The facts and matters set forth herein are true upon my own personal knowledge and, if called to testify, I could and would competently testify thereto.

2. The Debtors are both subchapter S corporations co-owned by me and Barbara Mendelsohn. Pursuant to franchise agreements, the Debtors currently own and operate 13 "El Pollo Loco" restaurants in Southern California, with a corporate headquarters in Agoura Hills.[1] El Pollo Loco is the nation's leading quick-service restaurant chain specializing in flame-grilled chicken. The Debtors currently have 255 employees. In 2010, the Debtors had gross revenues of approximately $16.7 million, with net store operating profits of approximately $2.2 million.

The Debtors' Capital Structure

3. As of February 3, 2011 (the "Petition Date"), the Debtors' assets are worth approximately $10 million. To determine this value, I used a standard methodology that can be used to establish a purchase price for any particular restaurant assets. This methodology begins with determining the store level earnings before interest, depreciation, taxes and amortization for the most recent trailing twelve periods of operations and adding back a management annual salary of $50,000, multiplied by a value multiple. The value multiple will vary depending on several variables, but it would be common to apply a 3.5x to 4.0x multiple to determine the purchase price. For this valuation I used a 3.5x multiple. This valuation is consistent with preliminary valuations obtained from third party appraisers.

4. The Debtors currently owe approximately $4.2 million to General Electric Capital Corporation ("GECC"), which GECC alleges is secured by substantially all of the Debtors' assets. In addition to GECC, the Debtor also has a number of other secured creditors that assert a security

---

[1] Mi Pollo (or its predecessor), which began operating in 1986, owns the franchise locations located in Thousand Oaks (591 Moorpark Road) and El Segundo. Pollo West (or its predecessor), which began operating in 1994, own the franchise locations located in Northridge, Santa Maria, Los Angeles, Paso Robles, Glendale, Van Nuys, Ventura, Thousand Oaks (2750 Camino Dos Rios), Oxnard, and Agoura Hills.

interest in the Debtors' assets, including the Debtors' cash. These secured creditors include AMRESCO Commercial Finance, LLC, with a claim of approximately $250,000, Rewards Network Establishment Services, Inc. with a claim of approximately $78,000, and the Jani Family Trust, with a claim of approximately $318,000.

5. Not including intercompany accounts, the Debtors have approximately 140 unsecured creditors that are owed, in the aggregate, approximately $477,600, consisting primarily of amounts owed for supplies and other general operating expenses.

Events Leading To The Chapter 11 Filing

6. In 2006, the Debtors borrowed approximately $4 million from GECC to equip several of their locations. GECC made another equipment loan in 2007 in the amount of $665,000, and a final equipment loan in 2009 in the amount of $350,000. In addition, GECC is the assignee of a $350,000 promissory note executed by Pollo West in 1999 (collectively, the "GECC Indebtedness"). As of the Petition Date, the GECC Indebtedness is in the approximate principal amount of $3.8 million plus approximately $400,000 in interest.

7. In April 2007, the Debtors approached GECC for development financing. The parties engaged in extensive negotiation and exchange of proposals through September 2008. In reliance upon a commitment letter provided by GECC, the Debtors proceeded with the start of construction of a new location in Santa Maria. In October 2008, to the surprise of the Debtors and after extensive negotiation of final documentation, GECC, without explanation, formally refused to provide the financing that had been negotiated over the prior 18 months.

8. Shortly thereafter, the Debtors were able to obtain a proposal for a $2.7 million revolving line of credit from a new lender, which would be used to fund the Santa Maria construction, remodel existing locations, refinance various existing secured indebtedness, and provide working capital. As a condition to the proposal, the new lender required that GECC release its blanket lien on certain of the Debtors' assets that GECC had not financed. In June 2009, GECC refused the request to release its blanket lien, which in turn caused the new lender to terminate its proposal.

9. Facing mounting payables to contractors and vendors relating to the Santa Maria construction, the Debtors went back to GECC, which only offered to advance approximately $350,000.

With little alternative, the Debtors agreed to the $350,000 loan and funded approximately $1.5 million in construction costs related to the Santa Maria location from savings and working capital.

10. While the Debtors were forced to use savings and working capital to fund the Santa Maria construction, the Debtors, similar to many food franchisees across the country, began experiencing a significant slow down in business in 2008 arising from the national financial crisis and corresponding reduction of consumer spending. Faced with significant cash flow problems, the Debtors stopped making payments to GECC in August 2009 and requested that GECC negotiate a loan modification. The Debtors and GECC engaged in numerous communications and exchanges of informal proposals in the following months. Finally, working with outside consultants, the Debtors made a formal restructuring proposal in July 2010 that received initial verbal approval from GECC. Before the proposal could be implemented, however, GECC changed personnel assigned to the loan and the new personnel refused to honor the prior approval. Instead, GECC insisted on a full audit as a condition to any restructuring consideration.

11. The audit was conducted in October 2010 and the results communicated to the Debtors in November 2010. As a result of the audit, and GECC's interpretations of the auditors' findings, GECC refuse to engage in further meaningful restructuring negotiations. Specifically, GECC focused on the fact that the audit alleged that over many years the Debtors had reimbursed the substantial medical expenses of insiders, made loans to insiders that were not repaid, and employed family members. The audit also was critical of the Debtors' financial controls and accounting.

12. The Debtors strongly disputed any allegations of impropriety. Many of the alleged facts revealed by the audit simply demonstrated that the Debtors operated similar to many other small family businesses and did not raise any concern from GECC until the Debtors were unable to make payments in 2009. To address any legitimate concerns that GECC had concerning operations and expenditures and in recognition that the GECC Indebtedness was in default, the Debtors committed to the employment of an experienced Chief Restructuring Officer who would, among other responsibilities, have control over the Debtors' expenditures. All of the Debtors' proposals to GECC were rejected.

13. On December 23, 2010, GECC filed a complaint against the Debtors in the Los Angeles County Superior Court and filed an ex parte application for the appointment of a receiver. On

February 3, 2011, the Superior Court granted the motion and appointed a receiver.

14. In my judgment, control over the Debtors' operations by a receiver would destroy any chance the value of the Debtors' assets would be maximized. As set forth above, I believe that the Debtors' assets are worth approximately $10 million, which is substantially more than the GECC Indebtedness. However, if the receiver is in control of operations, the receiver, selected by GECC, likely would liquidate the franchises as quickly as possible solely to satisfy the GECC Indebtedness as quickly as possible, which would destroy millions of dollars of value. Furthermore, the receiver selected by GECC, Trigild, Inc., one of the largest providers of receiver services in the United States, would have no incentive to minimize expenses and, I estimate, would incur fees of over $1 million over a one-year period, which would further reduce or eliminate any recovery by other creditors or shareholders.

15. Under these circumstances, I determined that a chapter 11 filing for each of the Debtors was necessary to preserve and maximize the value of the Debtors' assets for the benefit of all interested parties. Furthermore, to preempt any arguments from GECC concerning financial controls, the Debtors engaged Anthony W. Shepherd, a very experienced and independent financial consultant, to serve as the Debtors' Chief Restructuring Officer during the chapter 11 cases.

Facts Relating To The Motion For Joint Administration

16. As set forth above, the Debtors are both subchapter S corporations owned by me and Barbara Mendelsohn. The Debtors engage in the identical business of operating El Pollo Loco franchises, have common management, and common cash management. With the exception of a few real property leases, the Debtors are joint obligors on substantially all of their outstanding secured debt.

Facts Relating To Motion To Extend Time To File Schedules

17. While the Debtors maintain accurate books and records and are optimistic that they will be able file their schedules and statements of financial affairs within 14 days of the Petition Date, the Debtors are a relatively small business with limited resources, and the preparation of accurate schedules and statements will be time-consuming and require key officers and employees to be diverted from the business operations. I believe that an extension of the deadline for an additional 30

days should afford the Debtors adequate time to complete and file their schedules and statements.

Facts Relating To The Motion To Use Cash Collateral

18. As a food franchisee whose value is dependent on cash flow, the Debtors must continue to operate in order to preserve the Debtors' going concern value. The Debtors have prepared a 13 week budget (the "Budget") that is attached hereto as Exhibit A. The Budget sets forth the Debtors' anticipated cash needs through May 4, 2011. As set forth in the Budget, the Debtors require cash for the primary purposes of: (1) payroll, (2) supplies, (3) rent, and (4) royalty and advertising franchise fees. With respect to the purchase of supplies, the Debtors utilize one primary supplier approved by the Debtors' franchisor. The Debtors currently are negotiating with that supplier to continue the existing beneficial trade terms on a going forward basis. As reflected in the Budget, the Debtors project that their cash balance will increase from approximately $81,086 on the Petition Date to approximately $437,735 on May 4, 2011.

19. The Budget covers the period through May 4, 2011, and may be amended or modified during the interim period until a final hearing on the cash collateral motion can be held. The Debtors will attempt, prior to a final hearing on the cash collateral motion, to negotiate a consensual cash collateral agreement with some or all of their secured creditors. If and when a consensual agreement is reached, the Debtors will file a supplement to the cash collateral motion describing the terms of the consensual agreement and requesting that the Court approve the consensual agreement at the final hearing. If for any reason a consensual agreement is not reached before the final hearing, the Debtors will file a revised cash collateral Budget and request that the Court approve the revised Budget at the final hearing.

20. As franchisees, the Debtors utilize a single supplier, MBM Corporation ("MBM"), for substantially all of their goods, including food, utensils, and various other items that are absolutely critical to the Debtors' operations. If MBM ceases delivery, the Debtors will be required to cease operations. Prepetition, MBM afforded the Debtors trade terms that allow for the Debtors to make payments to MBM for goods delivered 21 days prior. Payments are made electronically by the Debtors to MBM approximately every 2 days. The Debtors are currently negotiating with MBM to continue this practice postpetition. However, MBM requires that to continue affording the Debtors prepetition

1  trade terms, the prepetition amounts owed to MBM must be paid in the ordinary course. The Budget
2  includes amounts owing to MBM for goods delivered prepetition and a chart detailing the payments
3  proposed to be made to MBM is attached hereto as Exhibit B. I believe that it is imperative that the
4  Debtors be able to make these payments and continue to be afforded these trade terms. It is my
5  opinion that, without such trade terms, the Debtors' business would likely collapse.

6      21.    The Debtors will suffer immediate and irreparable harm unless they are permitted to
7  pay their essential expenses prior to a final hearing on the cash collateral motion. Most significantly,
8  the Debtors have monthly payments for royalty and advertising franchise fees of approximately
9  $90,000 and payroll of approximately $86,000 due on February 9, 2011 and every week thereafter.
10 Additionally, the Debtors pay their sole supplier approximately every two days with amounts owed
11 ranging from approximately $90,000 to $110,000 per week. If the Debtors are not permitted to pay
12 their employees, supplier and other critical expenses, the Debtors will be required to cease operations,
13 which will be extremely damaging to the Debtors' estates.

14      <u>Facts Relating To The Motion To Pay Employees</u>

15      22.    The Debtors have 255 employees, all of whom are located in California and all of whom
16 are paid on a bi-weekly basis. In 2010, the Debtors' average aggregate monthly payroll was
17 approximately $132,000, and average aggregate monthly payroll tax was approximately $33,000. In
18 addition, the Debtors reimburse eligible employees for certain out-of-pocket business expenses incurred
19 in the ordinary course of business, such as travel expenses.

20      23.    The Debtors also offers a benefits package to some or all of its employees (the "Employee
21 Benefits"), including the following: (a) paid time off for holidays; (b) paid time off for vacation; (c) paid
22 time off for sick days; (d) medical insurance; (e) dental insurance; and (f) vision insurance. The
23 combined monthly cost of medical, dental and vision insurance is approximately $5,243 per month for
24 all non-insider employees. In addition, the Debtors pay $3,412 every other month for medical insurance
25 for insiders. Certain employees have accrued vacation and sick leave pay based upon work performed
26 prepetition, totaling approximately $122,681.97. A chart detailing the amounts owing by the Debtors as
27 of the Petition Date for all accrued paid leave for each employee is attached hereto as Exhibit C.

28      24.    The Debtors paid their most recent payroll on February 2, 2011, and are current on

compensation payment obligations to regular employees and premium payment obligations with respect to the various insurance policies maintained for the benefit of employees. The next payroll, in the approximate amount of $86,682, is scheduled for February 9 2011 (the "February 9 Payroll"). The February 9 Payroll covers the period of January 20, 2011, to February 3, 2011. No anticipated payment for any one employee exceeds $10,950.00.

25. The Debtors use NetPay Services, Inc. ("NetPay") to pay its employees. Once a week, NetPay automatically withdraws funds from the Debtors' account at Bank of America to meet the Debtors' payroll obligations. The Debtors do not use a direct deposit system. Rather, prior to each bi-weekly payroll, the Debtors provide NetPay with relevant payroll information, which NetPay uses to electronically deduct the appropriate amounts from the Debtors' payroll accounts for employee payroll and related taxes. NetPay then issues checks and delivers the printed paychecks to the restaurant franchises where they are handed out to the employees.

26. I work full-time for the Debtors and am responsible for all facets of the Debtors' operations, including managing daily operations, working with store managers, communicating with the franchisor, setting budgets, projecting cash flow, and performing every other service required of a president of a company of the Debtors' size and operations. As part of the Debtors' efforts to conserve funds for operations and save on expenses, I have not received payment of my regular compensation since January 5, 2011. Consequently, the Debtors owe me payment of my salary earned from January 6, 2011 to the Petition Date in an amount totaling $17,307.70. In addition, the Debtors historically have reimbursed my business expenses as part of my compensation. As of the Petition Date, I have outstanding expense reimbursement claims totaling approximately $2,700. I have limited resources and am dependent on a salary from the Debtors in order to pay my day to day living expenses.

Facts Relating To The Motion To Continue Customer Programs

27. In the competitive business of fast food and take out dining, the El Pollo Loco franchisor and, correspondingly, the Debtors as franchisee, have sought to attract customers and maintain brand loyalty by, among other things, offering top quality food with quick service and at reasonable prices. As part of these efforts, in the ordinary course of business, the Debtors have offered and maintained certain advertising and promotion programs and other customer programs to generate interest in the Debtors'

products and entice customers to visit the stores (collectively, the "Customer Programs"). Because of the heavy competition in the restaurant industry, the Debtors rely on the franchise advertising and the ability to honor the Customer Programs.

28. As part of its Customer Programs, the Debtors honor coupons and discounts issued by the franchisor and advertised on television, radio and in local print media, including customer mailings. The Debtors also participate in a franchise-based corporate program under which sales of a certain dollar amount will qualify the corporate customer for a gift card for future purchases. Finally, the Debtors accepts El Pollo Loco gift cards, which can be purchased at any El Pollo Loco store or online, and can be redeemed at any store for menu items, up to the value of the gift card.

29. Because the Customer Programs are primarily established by El Pollo Loco, it is not possible for the Debtors to estimate the value of the outstanding, prepetition programs, coupons and/or gift cards at any one time. I believe, however, that the Debtors are and will be capable of honoring all such Customer Programs to its customers as usual upon approval by the Court.

30. At this critical time, the Debtors cannot afford to be placed at a competitive disadvantage with respect to customers. If the Debtors are not permitted to honor the Customer Programs, the Debtors will lose significant goodwill with customers, who will likely search for alternative franchisees that are honoring the Customer Programs. Therefore, it is critical that the Debtors' Customer Programs be maintained.

I declare that the foregoing is true and correct to the best of my knowledge.

Executed this 4th day of February 2011 at Agoura Hills, California.

_____
Michaela Mendelsohn

# EXHIBIT A

**Pollo West Corp., Inc. and Mi Pollo, Inc.**
**13 Week Rolling Cash Flow Projection**

| For Week Ending: | 02/09/11 | 02/16/11 | 02/23/11 | 03/02/11 | 03/09/11 | 03/16/11 | 03/23/11 | 03/30/11 | 04/06/11 | 04/13/11 | 04/20/11 | 04/27/11 | 05/04/11 | Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Chapter 11 Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 1 - 13 |
| Sales Forecast | 340,392 | 354,575 | 357,848 | 354,575 | 354,575 | 354,575 | 365,153 | 362,865 | 330,489 | 359,574 | 379,455 | 365,360 | 375,698 | 4,655,134 |
| Beginning Cash Balance | $ 81,086 | $ 111,509 | $ 208,010 | $ 314,867 | $ 331,890 | $ 434,195 | $ 254,656 | $ 377,017 | $ 360,560 | $ 448,928 | $ 256,536 | $ 383,595 | $ 482,465 | $ 81,086 |
| **CASH RECEIPTS TO DEBTORS:** | | | | | | | | | | | | | | |
| Store Receipts - Bank of America | 214,447 | 223,382 | 225,444 | 223,382 | 223,382 | 223,382 | 230,046 | 228,605 | 208,208 | 226,532 | 239,057 | 230,177 | 236,690 | 2,932,734 |
| Store Receipts - Credit Cards | 125,945 | 131,193 | 132,404 | 131,193 | 131,193 | 131,193 | 135,107 | 134,260 | 122,281 | 133,042 | 140,398 | 135,183 | 139,008 | 1,722,400 |
| Other | | | | | | | | | | | | | | |
| Total Cash Inflows During the Period: | 340,392 | 354,575 | 357,848 | 354,575 | 354,575 | 354,575 | 365,153 | 362,865 | 330,489 | 359,574 | 379,455 | 365,360 | 375,698 | 4,655,134 |
| **CASH DISBURSEMENTS:** | | | | | | | | | | | | | | |
| **Stores Operating Expenses** | | | | | | | | | | | | | | |
| Food - MBM | (100,671) | (104,866) | (105,834) | (104,866) | (104,866) | (104,866) | (107,994) | (107,317) | (97,742) | (106,344) | (112,224) | (108,055) | (111,113) | (1,376,756) |
| Operating Supplies | | | | | | | | | | | | | | |
| Security | (3,830) | | | (505) | | | | | (505) | | | | (505) | (5,345) |
| Repairs & Replacement | (12,649) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (4,800) | (70,249) |
| Outside Services | (3,456) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (3,700) | (47,856) |
| Store Telephone | (2,986) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (8,986) |
| Store Utilities | (35,761) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (12,240) | (182,641) |
| Payroll Stores (includes taxes) | (86,682) | (84,814) | (87,702) | (84,538) | (84,538) | (84,538) | (87,060) | (86,514) | (78,795) | (85,730) | (90,470) | (87,109) | (89,574) | (1,118,063) |
| Health Insurance | (5,243) | | (8,655) | | | | | (5,243) | | | | (8,655) | | (27,796) |
| Workers Comp Insurance | (12,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (42,500) |
| Store Rent-Rancho Victoria | | | | | | | | | | (9,402) | | | | (18,803) |
| Store Rent-Kanan | | | | | | (11,787) | | | | (11,787) | | | | (23,574) |
| Store Rent-Newbury Park | | | | | | (7,935) | | | | (7,935) | | | | (15,870) |
| Store Rent-Ventura | | | | | | (12,696) | | | | (12,696) | | | | (25,392) |
| Store Rent-Van Nuys | | | | | | (12,000) | | | | (12,000) | | | | (24,000) |
| Store Rent-Glendale | | | | | (4,296) | | | | (4,296) | | | | (4,296) | (12,888) |
| Store Rent-Western | | | | | | (12,549) | | | | (12,549) | | | | (25,098) |
| Store Rent-El Segundo | | | | | | (12,575) | | | | (12,575) | | | | (25,150) |
| Store Rent-Lindero | | | | | | (9,846) | | | | (9,846) | | | | (19,692) |
| Store Rent-Thousand Oaks | | | | | | (9,178) | | | | (9,178) | | | | (18,356) |
| Store Rent-Paso Robles | | | | | (13,333) | | | | (13,333) | | | | (13,333) | (39,999) |
| Store Rent-Northridge | | | | | | (5,000) | | | | (5,000) | | | | (10,000) |
| Store Rent-Santa Maria | | | | | | (9,000) | | | | (9,000) | | | | (18,000) |
| Royalties & Advertising | | | | | | (106,771) | | | | (117,417) | | | | (224,187) |
| Repairs & Maintenance Compensation | (2,861) | (2,861) | | (2,861) | | (2,861) | | (2,861) | | (2,861) | | (2,861) | | (20,027) |
| Business Insurance - Liability | (3,574) | (4,465) | | | | (4,465) | | | | | (4,465) | | | (16,969) |
| Taxes, Licenses & Permits | | | | | | | | | | (49,000) | | | | (54,092) |
| Capital Expenditures | (5,092) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | (5,000) | | (5,000) | (5,000) | (5,000) | | (5,000) | (50,000) |
| **General & Administrative** | | | | | | | | | | | | | | |
| Corporate Compensation | (5,779) | (14,826) | (5,817) | (14,826) | (5,817) | (14,826) | (5,817) | (14,826) | (5,817) | (14,826) | (5,817) | (14,826) | (5,817) | (129,636) |
| Auto Expenses | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (656) | (8,527) |
| Catering Expenses | | | | | | | | | | | | | | |
| Legal & Professional | (5,361) | (1,500) | (4,500) | (1,500) | (4,500) | (1,500) | (4,500) | (1,500) | (4,500) | (1,500) | (4,500) | (1,500) | (4,500) | (41,361) |
| Bank Charges & Credit Card Fees | (17,875) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (4,375) | (70,375) |
| Office Expenses | (1,020) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (650) | (8,820) |
| Misc/Taxes/Permits | | (9,422) | (2,500) | | | (2,500) | (2,500) | | | | | (2,500) | | (16,922) |
| Telephone | (2,930) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (8,930) |
| Repair & Maintenance - Corporate Office | (1,043) | (400) | | | | (400) | | | | (400) | | | | (2,243) |
| CRO Fees | | | | (10,000) | | | | (10,000) | | | | (10,000) | | (30,000) |
| **Debt & Other Secured / Trust Payments** | | | | | | | | | | | | | | |
| GE Loan | | | | | | (27,000) | | | | (27,000) | | | | (54,000) |
| Capmark (GMAC) - AMRESCO | | | (1,063) | (2,211) | | | | | (2,211) | | | | (2,211) | (6,634) |
| Jani | | | | | | | | (1,063) | | | | (1,063) | | (3,188) |
| State Board of Equalization / Sales Tax | | | | (81,324) | | (40,000) | | (120,077) | | | | | (154,158) | (395,559) |
| Subtotal Disbursements | (309,969) | (258,074) | (250,991) | (337,551) | (252,270) | (534,115) | (242,792) | (379,322) | (242,121) | (551,966) | (252,396) | (266,490) | (420,428) | (4,298,485) |
| Cash Surplus / (Deficit) Before Professional Fees | 30,423 | 96,501 | 106,857 | 17,024 | 102,305 | (179,540) | 122,361 | (16,457) | 88,368 | (192,392) | 127,059 | 98,870 | (44,730) | 356,649 |
| Ending Cash Balance Before Professional Fees: | $ 111,509 | $ 208,010 | $ 314,867 | $ 331,890 | $ 434,195 | $ 254,656 | $ 377,017 | $ 360,560 | $ 448,928 | $ 256,536 | $ 383,595 | $ 482,465 | $ 437,735 | $ 437,735 |
| **Professional Fees:** | | | | | | | | | | | | | | |
| Restructuring Expenses - Legal (A) | | | | | | (50,000) | | | | (50,000) | | | | (100,000) |
| Subtotal of Professional Fees: | - | - | - | - | - | (50,000) | - | - | - | (50,000) | - | - | - | (100,000) |
| Ending Cash Balance after Professional Fees: | $ 111,509 | $ 208,010 | $ 314,867 | $ 331,890 | $ 434,195 | $ 204,656 | $ 327,017 | $ 310,560 | $ 398,928 | $ 156,536 | $ 283,595 | $ 382,465 | $ 337,735 | $ 337,735 |

Notes:
(A) Restructuring Expenses - Legal: Will be accrued but not paid until after such expenses are approved by the court.

13 WK CASHPROJECTION 020411                    DRAFT - SUBJECT TO CHANGE                    Printed: 2/4/2011  2:17 PM

EXHIBIT A
Page 10

# EXHIBIT B

# EXHIBIT B

## Proposed Payments to MBM for Prepetition Amounts Owed

| Date (approx.) | Amount (approx.) |
|---|---|
| February 4, 2011 | $36,538 |
| February 7, 2011 | $30,360 |
| February 8, 2011 | $15,912 |
| February 9, 2011 | $7,325 |
| Week ending February 16, 2011 | $107,525 |
| Week ending February 23, 2011 | $105,208 |
| **Total** | **$302,868** |

# EXHIBIT C

# **EXHIBIT C**

## **ACCRUED VACATION/SICK TIME PER EMPLOYEE**

| Store | Manager | wk | Total hrs | Sick | Rate/hr wk | Total amt |
|---|---|---|---|---|---|---|
| 3540 | Lopez, Maria C | 4 | 160 | 2.67 | 28.75 | 4,676.76 |
|  | Lemus, Evelyn | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  | Moran, Jazmin | 4 | 160 | 2.67 | 12.00 | 1,952.04 |
|  | Joj, Valeriana | 4 | 160 | 2.67 | 10.00 | 1,626.70 |
|  |  |  |  |  |  | - |
| 3237 | De La Cruz Evelyn | 0 |  |  | 13.00 | - |
|  | Flores, Maria | 4 | 160 | 2.67 | 11.00 | 1,789.37 |
|  | Cynthia, Mena | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  |  |  |  |  |  | - |
| 3266 | Alcaraz, Juan | 4 | 160 | 2.67 | 9.50 | 1,545.37 |
|  | Duran, Tobias | 4 | 160 | 2.67 | 12.75 | 2,074.04 |
|  |  |  |  |  |  | - |
| 3410 | Ayon, Veronica | 4 | 160 | 2.67 | 25.00 | 4,066.75 |
|  | Pelayo, Anabel | 4 | 160 | 2.67 | 14.00 | 2,277.38 |
|  | Ortiz, Rocio | 4 | 160 | 2.67 | 11.00 | 1,789.37 |
|  |  |  |  |  |  | - |
| 3556 | Santiago, Birgen | 0 |  |  | 19.25 | - |
|  | Godoy, Fidel | 2 | 80 | 2.67 | 9.25 | 764.70 |
|  | Rodrigez, Martha | 4 | 160 | 2.67 | 10.00 | 1,626.70 |
|  |  |  |  |  |  | - |
| 3640 | Celedon, Mariela J | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  | Pascual C. Blanca | 4 | 160 | 2.67 | 11.00 | 1,789.37 |
|  |  |  |  |  |  | - |
| 3629 | Peinado, Candy | 4 | 160 | 2.67 | 19.25 | 3,131.40 |
|  | Tercero, Jeremias | 4 | 160 | 2.67 | 12.00 | 1,952.04 |
|  | Rodriquez, Maria | 4 | 160 | 2.67 | 10.00 | 1,626.70 |
|  | Cassaundra. Floys | 4 | 160 | 2.67 | 8.75 | 1,423.36 |
|  |  |  |  |  |  | - |
| 3401 | Flores, Salamon | 4 | 160 | 2.67 | 25.00 | 4,066.75 |
|  | Pedro, Rayes | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  | Velasco, Ines | 4 | 160 | 2.67 | 9.25 | 1,504.70 |
|  |  |  |  |  |  | - |
| 3394 | Felix, Joy | 4 | 160 | 2.67 | 27.50 | 4,473.43 |
|  | Ayala, Mercedes | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  | Romero, Marco | 0 | 0 |  | 10.50 | - |
|  | Rodriguez, Nancy | 0 | 0 |  | 9.00 | - |
|  |  |  |  |  |  | - |
| 3402 | Lopez, Acosta, Delia | 4 | 160 | 2.67 | 19.25 | 3,131.40 |
|  | Petra, Andrew | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
|  | Cruz, Consuelo | 4 | 160 | 2.67 | 12.00 | 1,952.04 |
|  | Hernandez, Ana | 0 |  | 0 |  | 9.00 | - |
|  |  |  |  |  |  | - |
| 3451 | Maldonado, Andres | 4 | 160 | 2.67 | 19.25 | 3,131.40 |
|  | Romo Mora, Maria S | 4 | 160 | 2.67 | 10.25 | 1,667.37 |
|  | Hernandez, Edith | 4 | 160 | 2.67 | 11.75 | 1,911.37 |

EXHIBIT C
Page 12

## EXHIBIT C

## ACCRUED VACATION/SICK TIME PER EMPLOYEE

| Store | Manager | wk | Total hrs | Sick | Rate/hr wk | Total amt |
|---|---|---|---|---|---|---|
| | | | | | | - |
| 3457 | Lemus, Mayra | 4 | 160 | 2.67 | 19.25 | 3,131.40 |
| | Hernandez V. Jose | 4 | 160 | 2.67 | 13.00 | 2,114.71 |
| | Majono, Rosa | 4 | 160 | 2.67 | 12.50 | 2,033.38 |
| | Briseno, Magualida | 4 | 160 | 2.67 | 11.50 | 1,870.71 |
| | | | | | | - |
| 3496 | Guevarra, Elias | 4 | 160 | 2.67 | 19.25 | 3,131.40 |
| | Rivera, Carmen | 4 | 160 | 2.67 | 11.00 | 1,789.37 |
| | Barbic, Olga P. | 0 | 0 | 0 | 10.00 | - |
| | | | | | | - |
| Office | Lavin, Michael | | 266.64 | 2.67 | 32.00 | 8,617.92 |
| | Tayebeh Baigi | 2 | 50 | 1 | 17.00 | 867.00 |
| | Collins, Lisa | 2 | 80 | 2.67 | 17.00 | 1,405.39 |
| | Diaz, Frank | 22 | 880 | 2.67 | 27.75 | 24,494.09 |
| | Sandoval Sal | 3 | 120 | 2.67 | 37.40 | 4,587.86 |

**Total** **122,681.97**

EXHIBIT C
Page 13

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**PEITZMAN, WEG & KEMPINSKY LLP**
**10100 Santa Monica Blvd., Suite 1450**
**Los Angeles, CA 90067**

A true and correct copy of the foregoing document described as **Declaration of Michaela Mendelsohn in support of Emergency "First Day" Motions** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 4, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Susan K Seflin    sseflin@wrslawyers.com
- David B Shemano    dshemano@pwkllp.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **February 4, 2011,** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**Served by Overnight Mail:**
Hon. Victoria S. Kaufman
United States Bankruptcy Court - Central District of California
21041 Burbank Boulevard, Suite 354
Woodland Hills, CA 91367

**Served by Overnight Mail:**
United States Trustee (SV)
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 4, 2011,** I served the following person(s)

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010    **F 9013-3.1.PROOF.SERVICE**

and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

**Served by Email:**
**Counsel for GECC**
Craig Miller, Esq. – *craigmiller@dwt.com*
Mary Haas, Esq. - *maryhaas@dwt.com*

**Served by Email:**
**Amresco/Cap Mark**
Chris Peters – *cpeters@amresco.com*

**Served by Email:**
**Alston & Bird LLP**
Jason Watson - *jason.watson@alston.com*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| **February 4, 2011** | **Daniel Marcus** | **/s/ Daniel Marcus** |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

**Additional Service List**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                                              **F 9013-3.1.PROOF.SERVICE**

**By Overnight Mail:**

| Rewards Network Establishment Services, Inc.<br>300 S. Park Rd., Ste 300<br>Hollywood, FL 33021 | Rewards Network Establishment Services, Inc.<br>2N Riverside Plaza, Ste 950<br>Chicago, IL 60606 | Jani Family Trust dated 4/13/90<br>2603 Tuscany Way<br>Fullerton, CA 92835<br>ATTN: Gunvan & Jani and Kunce Jani, Trustees |
|---|---|---|
| Meadowbrook Meat Co., Inc.<br>2641 Meadowbrook Road<br>Rocky Mount, NC 27802 | LCA Bank Corp.<br>1375 Deer Valley Drive, Ste 218<br>Park City, UT 84060 | |

**By US Mail:**

| LCA Bank Corp.<br>PO Box 1650<br>Troy, MI 48099-1650 | | |
|---|---|---|

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                                           **F 9013-3.1.PROOF.SERVICE**